UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PHONEDOCTORX, LLC, | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim-Defendant, | ) | Civil No. |
| | ) | 12-12281-FDS |
| v. | ) | |
| | ) | |
| HEALTHBRIDGE MANAGEMENT, INC.; HEALTHBRIDGE MANAGEMENT, LLC; 221 FITZGERALD DRIVE OPERATING COMPANY, LLC; and 64 PERFORMANCE DRIVE OPERATING COMPANY, LLC, | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim-Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| 49 THOMAS PATTEN DRIVE OPERATING COMPANY, LLC; 312 MILLBURY AVENUE OPERATING COMPANY, LLC; 2101 WASHINGTON STREET OPERATING COMPANY, LLC; 750 WOBURN STREET OPERATING COMPANY, LLC; 57 OLD ROAD TO NINE ACRE CORNER OPERATING COMPANY, LLC; 178 LOWELL STREET OPERATING COMPANY, LLC; 199 ANDOVER STREET OPERATING COMPANY, LLC; PARK, MARION, AND VERNON STREET OPERATING COMPANY, LLC; 548 ELM STREET OPERATING COMPANY, LLC; and 265 ESSEX STREET OPERATING COMPANY, LLC, | ) | |
| | ) | |
| Counterclaim-Plaintiffs. | ) | |

**MEMORANDUM AND ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action for breach of contract. Plaintiff PhoneDOCTORx provided telemedicine services to various health care facilities from 2006 to 2012. It alleges that those facilities failed to pay for all services utilized. Plaintiff originally brought suit against fourteen health care facilities, but has since dismissed its claims against all but four. Prior to the stipulation of dismissal, the fourteen original defendants brought counterclaims for breach of contract and under Mass. Gen. Laws ch. 93A, contending that PhoneDOCTORx improperly demanded payment for services that it did not provide. Jurisdiction is based on diversity of citizenship.

Defendants have moved for summary judgment on plaintiff's breach of contract claim and have joined with the ten other counterclaim-plaintiffs in moving for summary judgment on the counterclaims. Plaintiff has cross-moved for summary judgment on the counterclaims. For the reasons set forth below, defendants' motion as to plaintiff's claims will be granted in part and denied in part, plaintiff's motion on the counterclaims will be granted in part and denied in part, and counterclaim-plaintiffs' motion will be denied.

**I.  Background**

Unless otherwise noted, the following facts are undisputed.

**A.  Factual Background**

PhoneDOCTORx is a Massachusetts LLC and a provider of telemedicine services in Massachusetts. Healthbridge Management, LLC, and Healthbridge Management, Inc., now known as DES Holding, Inc., manage and oversee the operations of various health-care and nursing facilities, including those that are party to this suit.

On January 10, 2006, PhoneDOCTORx entered into a contract with 221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center ("New Bedford Health"), a skilled nursing facility in New Bedford, Massachusetts. The contract was for a one-year term and automatically renewed for additional one-year terms unless either party terminated the contract with 90 days' written notice.

The contract is seven pages long. Under the contract, PhoneDOCTORx was to provide various health-care related services to New Bedford Health. Those services were divided into two categories: "traditional services" and "telemedicine."

Under the category "traditional services," PhoneDOCTORx agreed to twelve itemized obligations for a fixed monthly fee of $2,000. Among the obligations were (1) to "provide AHP's and physicians necessary to provide regular visits to [New Bedford Health] as medically necessary"; (2) to "provide physicians who with the assistance of AHP's will complete initial History and Physicals, thirty and sixty day visit evaluations, and discharge evaluations on all [PhoneDOCTORx] patients at [New Bedford Health]"; (3) to "provide physicians and AHP's to complete additional on-site evaluations of [Phone DOCTORx's] patients at [New Bedford Health], as deemed medically necessary"; and (4) to "meet with patients and families on a schedule, or on an as needed, basis." (Pl. Mem. Ex. 4 at 3) (mistakes in original).[1] Nothing in that category specifically addresses telephone calls or the provision of medical services at a distance.

Under the category "telemedicine," the contract provided as follows:

In addition to the "more traditional" services outlined above . . .

---

[1] The acronym "AHPs" refers to "allied health professionals," such as medical technicians and therapists.

> [PhoneDOCTORx] will provide telemedicine coverage for medical problems that arise during the course of one of their patient's stay.
>
> <u>[Phone DoctorX] shall provide medical coverage services for [New Bedford Health] patients during the hours listed below</u>:
>
> [PhoneDOCTORx] shall staff a Telemedicine Call Center with AHP/physician during the hours of 5:00 PM to 11:00 PM Monday through Friday and 10:00 AM to 7:00 PM Saturday and Sunday. . . .
>
> Triage function to determine whether a patient can be treated through a telemedicine encounter, or whether a patient needs to be transferred to a hospital emergency room.
>
> Telemedicine evaluation and treatment for medical problems.
>
> Orders for laboratory tests and/or radiographic studies may be given during said telemedicine covering encounter. If necessary, such orders may be faxed or phoned directly to [New Bedford Health] by the covering telemedicine physician.
>
> A physician or AHP [allied health professional] will be available via telephone for follow up of the telemedicine encounter if said telemedicine encounter resulted in a diagnostic study being ordered.
>
> All telemedicine treatments will result in a medical record being created and a copy of the same will be timely routed to [New Bedford Health] for incorporation into its medical record.
>
> Install, operate, maintain and retain ownership of the [PhoneDOCTORx] patent-protected software and related process, to be installed on hardware provided by [New Bedford Health] (as listed below).

(Pl. Mem., Ex. 4 at 4 (emphasis and mistakes in original)). The term "telemedicine" was not defined. There is no specific reference to video communications.

As for New Bedford Health's obligations, the contract provided, among other things, as follows:

> [New Bedford Health] will purchase or lease necessary compatible telemedicine computer hardware.
>
> [New Bedford Health] will provide all connectivity to said telemedicine unit.

4

> As is the case with all calls to physicians from [New Bedford Health] facilities, [New Bedford Health] will provide a nurse who will present the patient to the [PhoneDOCTORx] telemedicine physician/AHP and to assist in the collection of data in the telemedicine encounter, as medically necessary.
>
> . . .
>
> To remit monthly payments of . . . $8,200.00, per month, per facility for connectivity, access to the aforementioned patent-protected software and program, and the baseline ninety (90) telemedicine calls per facility, per month to [PhoneDOCTORx], within thirty days of the close of each month.

(*Id.* at 4-5).

In the section labeled "Financial Terms," the contract stated, in part, as follows:

> The telemedicine services identified below are based on representations and best estimates from [New Bedford Health] staff that a 6 hour telemedicine shift might trigger 3 calls from a facility.
>
> In consideration of connectivity into the [PhoneDOCTORx] network of medical coverage, use of [PhoneDOCTORx's] patent protected, software [*sic*] and timely access to a [PhoneDOCTORx] covering physician via telemedicine, including ninety (90) telemedicine calls per facility, per month, [New Bedford Health] shall pay [PhoneDOCTORx], Eight Thousand, Two Hundred dollars ($8,200.00) per month. Calls from a facility over 90 shall be charged at a fair market rate of ninety dollars ($90.00) per call.
>
> Given the above, said fees are deemed commercially reasonable and fair market value by both entities as said fee for a telemedicine encounter, coupled with the hourly rate would equate to rates similarly charged for actual "hands-on" patient encounters.

(*Id.* at 5-6).

Two other contractual provisions are relevant. First, the parties agreed to "initially implement this program in the New Bedford Health Center," and stated that it was their "intent [] to thereafter implement this program in all [New Bedford Health] skilled nursing facilities" in Massachusetts, including implementation in no less than six such facilities within one year of the signing of the contract. (*Id.* at 6). Second, the contract included a non-waiver provision, stating

5

in part that "[a]n effective waiver of a right under this Agreement may be made by a party in writing executed by the party holding the right" and that "[n]o other waiver shall be recognized, or enforceable." (*Id.*). The contract does not state whether PhoneDOCTORx may charge interest for late payments.

In 2008, PhoneDOCTORx began providing the same services to 64 Performance Drive Operating Company, d/b/a Weymouth Health Care Center ("Weymouth Health"). The parties have been unable to locate a written contract, but agree that their agreement consisted of the same terms as the agreement between PhoneDOCTORx and New Bedford Health. In November 2010, PhoneDOCTORx entered into agreements with eleven additional facilities.[2] The 2010 contracts were similar in many respects, but contained different financial terms; among other differences, those contracts included a $1,500 per month access fee and a charge of $40 per call, and did not include a 90-call baseline.

Over the course of the contracts, PhoneDOCTORx sent monthly invoices to each of the facilities. The invoices to New Bedford Health and Weymouth Health never included charges for calls made above the 90-call baseline.

In 2011, the facilities terminated their respective contracts with 90 days' notice, which

---

[2] Ten of the facilities were originally defendants to this suit and remain counterclaim-plaintiffs: Park, Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center; 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center; 57 Old Road to Nine Acre Operating Company, LLC, d/b/a Concord Health Care Center; 265 Essex Street Operating Company, LLC, d/b/a Essex Park Rehabilitation and Nursing Center; 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center; 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center; 2101 Washington Street Operating Company, LLC, d/b/a Newton Health Care Center; 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center; 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center; and 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehabilitation Center. The eleventh facility, Redstone Health Care Center, has never been a party.

Although PhoneDOCTORx and the Calvin Coolidge Center did not enter into a written contract, the parties agree that the provision of services was governed by the same terms as the other 2010 contracts. A copy of the PhoneDOCTORx-Brookline Health contract is attached as exhibit 8 to plaintiff's memorandum.

PhoneDOCTORx acknowledges they had a right to do under the contract. PhoneDOCTORx, under the direction of a new CEO, Brian Lane, then conducted an audit of the facilities' contracts and services. As part of the audit, it counted every call—whether on the telephone, on the leased equipment, or by some other technology—as a "telemedicine" encounter under the contract. Based on that review, PhoneDOCTORx determined that the facilities had made calls in excess of the 90-call baselines but had not been charged for those services. For example, it determined that from 2006 through 2012, New Bedford Health had made 7,755 calls and Weymouth Health had made 6,763 calls in excess of their 90-call baselines. Accordingly, PhoneDOCTORx issued invoices to each of the facilities. Those invoices totaled $3.5 million in charges and were purportedly subject to a one-percent per month interest charge for payments made more than 30 days from the date of the invoice.

PhoneDOCTORx also included charges of $1,500 per month from May 2010 through February 2012 in the invoices it sent to Peabody Glen Health, Lexington Health, Brookline Health, and Calvin Coolidge Center. Those facilities did not, however, contract with PhoneDOCTORx until November 2010. PhoneDOCTORx now contends that the fees related to something called the Commonwealth Fund Study, which is the subject of a different contract between it, Healthbridge Management, and the facilities. However, when asked at his deposition whether the May to November 2010 charges and the claim for interest were "fair," PhoneDOCTORx CEO Lane answered "no." (Lane Dep. at 114-18).

At the same time, PhoneDOCTORx sent an invoice to Healthbridge Management for $2,222,200. It did so, according to PhoneDOCTORx, because the parties had not implemented telemedicine in six facilities by 2007, one year after the New Bedford Health contract was

7

signed. PhoneDOCTORx contends that it sent the invoice in good faith and on advice of counsel.

The facilities and Healthbridge objected to the invoices, contending that not every telephone call qualified as a telemedicine encounter and that it was not obligated to pay the other charges.

B.     **Procedural Background**

On October 31, 2012, PhoneDOCTORx filed a complaint in state court alleging breach of contract and breach of the implied covenant of good faith and fair dealing by defendants Healthbridge Management, Inc., New Bedford Health, Weymouth Health, Cedar Hill Health, Millbury Health, Newton Health, Wilmington Health, Concord Health, Lexington Health, Peabody Glen Health, Brookline Health, and Calvin Coolidge Center. The complaint claimed $1,527,751.11 in damages. On December 7, 2012, defendants removed the action to this Court.

On February 20, 2013, PhoneDOCTORx filed an amended complaint adding Healthbridge Management, LLC, and Essex Park as defendants and increasing its damages demand to $1,550,251.11. On March 20, 2013, defendants filed an answer and counterclaimed for breach of contract and under Mass. Gen. Laws ch. 93A, claiming as damages the costs of defending this action. On April 19, 2013, plaintiff filed a second amended complaint.

On March 3, 2014, after PhoneDOCTORx had waived $195,000 of monthly charges for facilities other than New Bedford Health and Weymouth Health, plaintiff stipulated to a dismissal with prejudice of its claims against Cedar Hill Health, Millbury Health, Newton Health, Wilmington Health,[3] Concord Health, Lexington Health, Peabody Glen Health,

---

[3] Plaintiff misspelled this party's name as "Willmington Health Care" in both the complaint and the stipulation of dismissal.

Brookline Health, Calvin Coolidge Center, and Essex Park. PhoneDOCTORx is therefore pursuing claims only against Healthbridge Management, Inc., Healthbridge Management, LLC, New Bedford Health, and Weymouth Health, though the other facilities remain in the case as counterclaim-plaintiffs. PhoneDOCTORx also has waived its claims against the Healthbridge entities relating to the allegedly delayed telemedicine implementation at additional sites.

The four remaining defendants have collectively moved for summary judgment as to plaintiff's claims. All counterclaim-plaintiffs, including the remaining defendants, have moved for summary judgment on the counterclaims. Plaintiff has cross-moved for summary judgment as to the counterclaims.

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but

instead must "present affirmative evidence." *Id*. at 256-57.

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*. Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted).

## III. Analysis

### A. Plaintiff's Claim for Breach of Contract

To prove a breach of contract under Massachusetts law, a plaintiff must show "that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 316 (D. Mass. 1997) (citations omitted); *accord Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999). In interpreting the contract, a court seeks to "give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible." *Shea v. Bay State Gas Co.,* 383 Mass. 218, 224-25 (1981).

If a contract is unambiguous, a court must interpret it in accordance with its ordinary and plain meaning. *See Citation Ins. Co. v. Gomez,* 426 Mass. 379, 381 (1998). An agreement is not ambiguous merely because "a controversy exists between the parties, each favoring an interpretation contrary to the other," or because a word has multiple dictionary definitions. *Id.* Rather, a contract provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Id.*; *see also*

*Kelly v. Dimeo,* 31 Mass. App. Ct. 626, 629 (1991). The determination of whether a contract is unambiguous is a question of law for the court. *Bank v. Thermo Elemental Inc.,* 451 Mass. 638, 648 (2008).

If, on the other hand, a contract is ambiguous, the court may look to extrinsic evidence "in order to give a reasonable construction in light of the intentions of the parties at the time of formation of the contract." *Samia Companies LLC v. MRI Software LLC*, 898 F. Supp. 2d 326, 335-36 (D. Mass. 2012) (quoting *President & Fellows of Harvard Coll. v. PECO Energy Co.*, 57 Mass. App. Ct. 888, 896 (2003)). For example, the court may consider the parties' negotiations, the course of performance, the prior course of dealing, and trade usage in the industry, as well as construe the language against the contract's drafter. *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 49 (1st Cir. 2004); *Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d 49, 52 (1st Cir. 1996). Ordinarily, ambiguities in contract language present questions of fact for the jury. *See Coll,* 50 F.3d at 1122. However, "if, despite the ambiguity, no reasonable person could interpret the contract as one party does, the court may enter judgment against that party." *Nadherny*, 390 F.3d at 48-49.

Defendants have moved for summary judgment on the ground that they did not breach the contract by refusing to pay for calls by New Bedford Health and Weymouth Health above the 90-per-month threshold. Whether summary judgment is appropriate depends, first, on whether plaintiff waived the charges by waiting up to five and one-half years to bill defendants, and second, on the meaning of the term "telemedicine call."

        **1.**    <u>**Waiver**</u>

The first question is whether plaintiff waived its right to payment by failing to send

11

invoices to defendants in a timely manner.

Waiver is "the voluntary relinquishment of a known right." *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 372 (D. Mass. 1991) (citing *St. John Bros. Co. v. Falkson*, 237 Mass. 399, 402 (1921)). While a waiver may be express or implied, proof of an implied waiver by conduct "must be unequivocal and must allow room for no other explanation of the conduct of the person who allegedly is waiving a contractual right." *Id.* Generally, waiver is a question of fact for the jury. *St. John Bros. Co.*, 237 Mass. at 402; *KACT, Inc. v. Rubin*, 62 Mass. App. Ct. 689, 695-96 (2004).

The only provision in the contract that addresses the timing of billing or payment states that New Bedford Health and Weymouth Health must remit monthly payments of $8,200 each for connectivity, access to the software and program, and the "baseline ninety (90) telemedicine calls per facility" within thirty days of the close of each month. (*Id.* at 5). Seemingly, no provision states that PhoneDOCTORx must bill for, or defendants must pay for, calls above the 90-call baseline within any specific time period.

Furthermore, the contract specifically provides that waiver of a right under the contract shall not be recognized or enforced unless made by the party holding that right in writing. (New Bedford Health Contract at 6). Defendants have submitted no such writing into evidence.

Even assuming that the contractual provision does not preclude any implied waiver, the evidence does not unequivocally demonstrate that such a waiver occurred. Plaintiff plausibly asserts that it mistakenly failed to bill for calls above the 90-call threshold, and then promptly billed for them after conducting an audit upon termination. Although a delay (in some instances) of five and one-half years is extraordinarily long, it is not outside the six-year statutory

12

limitations period for contract claims. *See* Mass. Gen. Laws ch. 260, § 2**;** *Town of Framingham v. Natick Mall, LLC*, 2011 WL 3524404, at *6 (Mass. Super. June 14, 2011) (applying statute of limitations for contracts to "underbilling mistakes" and finding obligation to pay for benefit received despite delayed invoicing); *see also Price Chopper, Inc. v. Consol. Beverages, LLC*, 2011 WL 901817, at *6 (D. Mass. Mar. 11, 2011).

Accordingly, defendants are not entitled to summary judgment on the ground that plaintiff waived its right to bill for calls above the 90-call baseline.

2. **"Telemedicine"**

The central dispute between the parties is whether (as plaintiff contends) every telephone call made by New Bedford Health and Weymouth Health to Phone DOCTORx qualifies as a "telemedicine" encounter under the contract, or whether (as defendants contend) only those calls during which "visualization equipment" was used so qualify.[4] Although the meaning of the term "visualization equipment" is unclear, defendants appear to use it to refer to a communication system in which video is used, allowing the physician and patient to see one another.[5]

The contract itself does not define the term "telemedicine."[6] It is nonetheless clear that a "telemedicine" encounter is distinct from a mere telephone call. First, the text of the contract

---

[4] The provision that "[c]alls from a facility over 90 shall be charged at a fair market rate of ninety dollars ($90.00) per call" clearly refers to the prior sentence, which states "[i]n consideration of . . . timely access to a PDR covering physician via telemedicine, including ninety (90) telemedicine calls per facility, per month," New Bedford Health shall pay $8,200. (New Bedford Contract at 5). Accordingly, the appropriate inquiry is not the meaning of "calls" generally, but specifically of "telemedicine calls."

[5] Although it is unclear, the term may also include a communications system that permits some degree of data interactivity—for example, so that a physician could access and create patient medical records remotely.

[6] Under "Financial Terms," the contract states that "[t]he parties understand that the fees specified below are based on [PhoneDOCTORx's] ability to leverage the telemedicine technology over a wide geographic region," and that "[t]elemedicine permits [Phone DOCTORx] physicians to treat patients at multiple locations, thereby permitting the fees for such services listed herein." (New Bedford Contract at 5).

includes an acknowledgment that "the services represented by this agreement represent a novel, unique and significant opportunity to improve patient care," and that "the program is by design a pilot." (New Bedford Contract at 2). Mere telephone calls between a physician and a patient—which have been taking place for more than a century—are neither "novel" nor "unique." Second, the contract requires that defendants "purchase or lease necessary compatible telemedicine computer hardware" and provide "connectivity" to the "telemedicine unit." (*Id.* at 4-5). Other than a telephone, neither special hardware nor special software would be necessary in order for a physician to make or receive telephone calls. Third, the contract provides that "[a]s is the case with all calls to physicians from [New Bedford Health] facilities, [New Bedford Health] will provide a nurse who will present the patient to the [plaintiff] telemedicine physician/AHP and to assist in the collection of data in the telemedicine encounter, as medically necessary." (*Id.*). That provision appears to draw a distinction between "all calls to physicians" and "telemedicine encounters," which as a matter of logic must comprise a subset of the former.[7]

In short, it seems plain that an audio-only telephone call between a physician and a patient, or a physician and a nurse, without more, is not a "telemedicine" encounter. To hold otherwise would require that the Court ignore both the terms of the contract and common sense. Patients and nurses have been calling doctors on the telephone for many years; it has been a basic part of the practice of medicine for decades, and does not require specialized equipment or expertise.

---

[7] The Court also notes the provision in the contract that states, "a physician or AHP will be available via telephone for follow up of the telemedicine encounter if said telemedicine encounter resulted in a diagnostic study being ordered." (Pl. Mem., Ex. 4 at 4). That provision would be superfluous if a simple telephone call (such as the contemplated follow-up call) qualified as a telemedicine encounter, as the contract states elsewhere that physicians or AHPs will be available for telemedicine encounters. *See Summit Packaging Sys., Inc. v. Kenyon & Kenyon*, 273 F.3d 9, 12 (1st Cir. 2001) ("[I]t is a basic principle of contract law that constructions that render contract terms meaningless should be avoided.")

Beyond that, however, the meaning of "telemedicine" is unclear. Among other things, the contract says next to nothing about the variety of other technologies that might be used in interactions between physicians, patients, nurses, AHPs, and medical record databases, or any "novel" or "unique" ways in which that technology might be used to provide health-care services. In particular, it says nothing about video communications or the use of "visualization equipment."

Plaintiff contends that the contract is ambiguous and that extrinsic evidence must therefore be consulted as to its meaning. It has submitted expert testimony and evidence of the course of dealing between the parties as proof that a "telemedicine" encounter can be a mere telephone call with a physician.[8] But extrinsic evidence may only be considered to resolve an ambiguity. Whatever ambiguities the contract may have, there are none as to the key question here: whether a mere telephone call to or from a physician, without more, constitutes a "telemedicine" encounter. Based on the language of the contract, it does not. To the extent that

---

[8] Defendants disagree that any extrinsic evidence is necessary, but argue that if such evidence is considered, it would support their position. For example, Massachusetts insurance law defines "telemedicine" as the "use of interactive audio, video or other electronic media for the purpose of diagnosis, consultation or treatment" but excludes "audio-only telephone, facsimile machines or email." Mass. Gen. Laws ch. 175, § 47BB(a). At least 16 other states have enacted similar provisions. *See, e.g.*, CaL. Bus. & Prof. Code § 2290.5(g)(3) (telehealth includes "telemedicine" as referenced by CMS); Colo. Rev. Stat. § 12-36-102.54(8) (telemedicine includes interactive audio, video, or data communication); Ga. Code Ann. § 33-24-56.4(b)(3) (telemedicine does not include standard telephone); Haw. Rev. Stat. § 453-1.(b) (telemedicine includes real-time web or video conferencing); Ky. Rev. Stat. Ann. § 205.510(15) (telehealth consultation requires use of advanced telecommunications technology); La. Rev. Stat. Ann. § 1262(4) (telemedicine does not include telephone conversation); Me. Rev. Stat. Ann. tit. 24-A, § 4316(1) (telemedicine does not include audio-only telephone); Md. Code. Ann., Health § 19-319(e)(I)(ii) (telemedicine does not include audio-only phone conversation); Mich. Compo Laws § 500.3476(2) (telemedicine requires physician be able to examine patient through real-time interactive audio or visual telecommunications); N.H. Rev. Stat. § 415-J:2(II) (telemedicine does not include use of audio-only telephone); N.M. Stat. Ann. § 13-7-14(H)(6) (telemedicine includes interactive simultaneous audio-visual technology); Okla. Stat. tit. 36, § 6802 (telemedicine does not include consultation by telephone or facsimile); Or. Rev. Stat. § 442.015(25) (telemedicine requires electronic communications); Tex. Gov't Code. Ann. § 531.001(8) (telemedicine involves use of advanced telecommunications technology other than telephone or facsimile); Vt. Stat. Ann. tit. 8, § 4100k(g)(4) (telemedicine does not include audio-only telephone); Va. Code. Ann. § 38.2-3418.16(B) (telemedicine does not include audio-only telephone).

15

plaintiff seeks damages for defendants' failure to pay charges for audio-only telephone calls to or from physicians above the 90-call monthly baseline, summary judgment will be granted to defendants. To the extent, if any, that the parties otherwise dispute the meaning of the term "telemedicine," it appears that there are disputed issues of material fact, summary judgment will be denied.

### B. Defendants' Counterclaim for Breach of Contract

Defendants[9] have counterclaimed for breach of contract, contending that plaintiff breached the contract by demanding payment not due under the contract or for services not rendered. Specifically, defendants object that plaintiff billed individual facilities after they had executed their right of termination, charged millions for defendants' failure to implement plaintiff's services in additional facilities (when, defendants contend, they were under no obligation to do so), and demanded prompt payment (with the threat of a late fee) for "overage calls that either never took place, or that were waived." (Def's Mem. at 16).

According to defendants, "[d]emanding payments for services never provided constitutes a breach of contract." (Def's Mem. at 16). Defendants, however, cite no law in support of this proposition. The term "breach of contract" is defined as "a failure to perform for which legal excuse is lacking." *Sterilite Corp. v. Continental Cas. Co.*, 20 Mass. App. Ct. 215, 220 (1985) (citing *Realty Developing Co. v. Wakefield Ready-Mixed Concrete Co.*, 327 Mass. 535, 537 (1951)) *rev'd on other grounds*, 397 Mass. 837 (Mass. 1986). None of the actions cited by defendants as a breach constitutes a failure to perform by plaintiff; nowhere in the contract did

---

[9] As explained above, counterclaim-plaintiffs consist of the four remaining defendants and the ten other original defendants in this case. In the interest of simplicity, the Court will refer to counterclaim-plaintiffs as "defendants" when analyzing the counterclaims.

16

plaintiff expressly promise not to send extraneous bills.  Thus, the counterclaim for defendants' breach of contract claim fails as a matter of law and plaintiff's motion for summary judgment as to this claim will be granted.[10]

### C. Defendants' Counterclaim for Violation of Chapter 93A

Defendants have also counterclaimed for violation of Mass. Gen. Laws. ch. 93A, resting their claim on the same factual premises as for their claim for breach of contract.  The parties have cross-moved for summary judgment.

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A § 2; *see* Mass. Gen. Laws ch. 93A § 11 (incorporating standard of § 2).  "[A] cause of action under c. 93A is 'not dependent on traditional tort or contract law concepts for its definition'" and "is not subject to the traditional limitations of preexisting causes of action."  *Kattar v. Demoulas,* 433 Mass. 1, 12-13 (2000) (citations omitted).  However, to constitute a violation, the objectionable action must "(1) [be] within the penumbra of a common law, statutory, or other established concept of unfairness; (2) [be] immoral, unethical, oppressive, or unscrupulous; or (3) cause[] substantial injury to competitors or other business people."  *Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 457 (2004) (internal quotation marks and citation omitted).  Generally, "a good faith dispute over billing or a simple breach of contract" does not create liability under chapter 93A.  *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55-56 (1st Cir. 1998).

As a threshold matter, plaintiff contends that defendants cannot maintain a claim because

---

[10] Under some circumstances, such actions could breach the covenant of good faith and fair dealing that is implied in every contract.  *See Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  Defendants, however, did not allege any such violation in their counterclaims and have not briefed the issue.

17

they did not suffer any damages from the alleged violations. Defendants admit that they incurred no direct damages, but assert that they may recover their attorney's fees expended defending against an improper lawsuit.

For a claim brought by a business plaintiff, § 11 authorizes private suit only where the plaintiff suffers "any loss of money or property, real or personal" as a result. Mass. Gen. Laws ch. 93A, § 11. "'Money' means money, not time, and . . . 'property' means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty." *Baldassari v. Public Fin. Trust*, 369 Mass. 33, 45 (1975). While a party cannot claim its attorney's fees in bringing a legal claim under chapter 93A, a party can claim expenses, such as attorney's fees, that it was "forced to incur . . . as a result of the [] initiation of litigation which itself constituted a violation of the statute." *Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 12, 21 (2003). The Supreme Judicial Court has upheld a finding of liability premised on expert witness and attorney's fees where the plaintiff had sued for unpaid bills and the defendant counterclaimed, alleging that those bills were for services not rendered and that plaintiff's suit was a violation of chapter 93A. *Columbia Chiropractic Grp., Inc. v. Trust Ins. Co.*, 430 Mass. 60, 63 (1999); *see also Jet Line Servs., Inc. v. Am. Employers Ins. Co.*, 404 Mass. 706, 718 (1989). Similarly, here, defendants' alleged attorney's fees qualify as damages under chapter 93A.

As to the substance of the chapter 93A claim, defendants essentially rely upon the same evidence as that supporting their contract claim. Certainly, there is evidence from which a reasonable factfinder could conclude that plaintiff attempted to use the invoices to gain an unfair advantage. *See Incase, Inc. v. Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass. 2006) *aff'd*, 488 F.3d 46 (1st Cir. 2007) ("[A] party who breaches a contract in deliberate attempt to obtain the

benefits of the contract, and to avoid fulfilling its own obligations under it, may have committed an unfair or deceptive act under chapter 93A."); *Price Chopper, Inc. v. Consol. Beverages, LLC*, 2011 WL 901817, at *9 (D. Mass. Mar. 11, 2011) (describing as a violation "the use of the breach of contract as a lever or wedge to enhance a party's bargaining power or exact control over the other party"). But other evidence points in the opposite direction. *See Zabin v. Picciotto*, 73 Mass.App.Ct. 141, 169 (2008) (describing that "a breach must be both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party" and that "[t]he breaching party's conduct must exceed the level of mere self-interest, rising instead to the level of commercial extortion or a similar degree of culpable conduct"). However, there are disputed issues of material fact, including a whether plaintiff acted in good faith. Summary judgment will therefore be denied as to the chapter 93A claim. *See Incase, Inc. v. Timex Corp.*, 488 F.3d 46, 57 (1st Cir. 2007) (explaining that "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact").

Accordingly, plaintiff's and counterclaim-plaintiffs' cross-motions for summary judgment as to the counterclaim under chapter 93A will be denied.

## IV. Conclusion

For the foregoing reasons,

1. defendants' motion for summary judgment as to the complaint is GRANTED to the extent that plaintiff asserts a claim for breach of contract arising out of defendants' failure to pay charges relating to audio-only telephone calls to or from physicians above the 90-call monthly baseline in the New Bedford Health and Weymouth Health contracts, and is otherwise DENIED;

2. counterclaim-plaintiffs' motion for summary judgment on the counterclaims is DENIED; and

3. plaintiff's motion for summary judgment is GRANTED as to the counterclaim for breach of contract and is otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: November 7, 2014